1639.32 Eugene Kline et al. v. Mortgage Electronic Registration Systems et al. Arguments not to exceed 15 minutes for plaintiffs, 15 minutes to be shared by defendants, Mr. Kline for the plaintiff's appellants. Before you get started, let's talk a minute to the appellee's lawyers. There are four of you who are going to argue, and I've got the order here from the clerk. And are you each going to take three plus minutes, whatever it is? One of the plans is that I'll open on behalf of Barclays and Wells Fargo. You're Mr. Pope? Yes, ma'am. All right, and you're... I'll help you out with Ms. Brown. I've got that. I just want to know how long each of you is going to talk. The division is 8-3-3-1. Okay, 8-3-3-1. Okay, got it. Good morning, Your Honors. We'd like to reserve two minutes for rebuttal. Okay. In 2005, after injuring his back and falling behind on his mortgage, Appellant Eugene Kline was forced to pay off amounts he allegedly owed after he was foreclosed on by the defendants. In November 2007, after a second foreclosure, he was forced to sell his home and his two loans were paid in full. Since that time, Mr. Kline has been seeking to find out exactly what legal fees and expenses he was charged, whether those amounts were legal, and whether the foreclosure actions instituted against him were properly brought. Unfortunately, what should have been a simple task has been instructed by the defendants' concealment of discoverable information and a series of false representations made by the defendants, both in the lower court and in the Ohio courts, entertaining the foreclosure actions. Regrettably, the lower court rewarded the defendants' misconduct and this litigation effectively spun out of control. How much money is involved if all of your claims, apart from class action claims, all of your claims that are presently on appeal, if you won all of them, how much money are we talking about? In actual damages, Your Honor? I'm not talking about the distress. I'm talking about the things that were paid. There is no distress here. We're talking about there were thousands of dollars, thousands of dollars in legal fees and expenses. Oh, the legal fees? Yes. This is all about legal fees. No, no. Not my legal fees, Your Honor. Let's start with three well-settled background principles. Well, that's not what Judge Rogers wants to start with. We're trying to find out how much money is at stake here. There were thousands of dollars in legal fees and expenses that were charged to my client. How much? At least several thousand dollars. But in this first case, we're talking about $412.96. And I'm sure there were other cases that were similar, but you're saying that these aggregated, this thousands of dollar figure that you're talking about, which includes the attorney's fees and costs. This has nothing to do with my attorney's fees and costs. In the 2005 mortgage foreclosure, which the evidence, which was belatedly produced in this litigation, indicates was improperly instituted. My client was forced to pay thousands of dollars in legal fees and expenses. How many thousands? How much money is at issue on this appeal? I believe it's probably somewhere between $3,000 and $4,000 in legal fees and expenses, which are the actual damages that were incurred in legal fees and expenses. And that's what's at issue in this appeal? That is what is at issue in terms of the damages, Your Honor. Obviously, it's a putative class action. Well, putting that aside. If you look at, let's see whose brief this is, Barclays, there's a list of what he was charged, right? The payoff on pages 4 and 5, you probably have it several places, where it lists the principal balance, the interest, the late charges, the escrow advance, and the estimated court costs. You know the list I'm referring to? I do, Your Honor. And then there's another one later, which is the smaller, the roughly $30,000 one, where there's 28 interest and reporting costs. All of the allegations in this case deal with elements of these two lists. Is that correct? Actually not, Your Honor. Well, that's my question then. What else is there? Because, as we indicated, there was, this list indicates that there were no attorney's fees charged. And for the first seven years of this litigation, it indicated that there were no attorney's fees charged. My question, I'm just talking about are the amounts included in these amounts, even though they're listed incorrectly? Or are there some other amounts floating out there? There are other amounts floating out there. What other amounts are floating out there? The other amounts are the legal fees that the defendants represented from the very outset of this lawsuit were never charged to the plaintiffs, which, once an accurate They were charged not in these lists? They were charged elsewhere? No, actually they were not charged in these lists. If they weren't charged, why are you complaining? I mean, that's why I'm asking. No, they were charged, Your Honor. They were charged in some third list that was sent to them? Not a third list, Your Honor. Well, how does it work? I think we explained this in our brief, Your Honor. We had a payoff. The payoff was based on certain amounts. The payoff was based on an interest payment for December 9th. You're talking about the difference in dates because of the fact that it was paid off earlier. I'm talking about an overpayment, Your Honor. Okay, so is it that you're saying that the interest and other fees that were paid off by your client and others similarly situated, part of that was impermissibly allocated to the payment of attorney's fees? Yes, in fact. Yes? Yes. Okay. In fact, the deponent for Barclays admitted that she couldn't say whether that was true or not in light of the evidence which had been previously concealed by the defendants for the first seven years of this litigation. We had an escrow history. We had numerous representations here, which are all in the record, which said that there were no legal fees charged. And why did they say that there were no legal fees charged? Because it's absolutely impermissible to charge legal fees in a foreclosure under Ohio law. So what's your best argument or best case to support your proposition that a creditor can be held liable under FDCPA even when it's refunded the improper payments? Where is the evidence of a refund, Your Honor? There is absolutely no evidence in the record of a refund. The idea that there was a refund was first brought up in an October 30th reply declaration by Ms. Cartmill. And in fact, it wasn't even brought up in that declaration. That's an affirmative defense which they never pled. And in fact, the idea that even at this point they can just say, well, maybe it was refunded. They don't say it was refunded. In fact, what did they say? What did they say in Cartmill's affidavit? They said it doesn't make a difference that we hid these amounts in the escrow history for seven years. It doesn't make a difference that we, in fact, filed and relied upon an improper escrow history which hid an escrow balance and which hid deductions for legal fees and expenses which they never showed because, lo and behold, this escrow balance came from a crude interest. Well, as we showed in our brief, that's an absolute falsehood. And it's a falsehood that's indicated by their own documents, Your Honor. We made an extensive analysis which showed and their own documents indicated that the interest was calculated based on a December 9th payment. Their own documents indicate. Your brief doesn't show or not show anything. Your brief is just your argument. The evidence is what has the capacity to show. So, I mean, I... Your Honor, we cite in rather exhaustive detail to the corporate defendant's own documents which show, and I'm happy to indicate to them, the payoff calculated interest at $42 a day based on a December 9th payoff date. And HOMEC documents show that they received the check on November 28th and said it should be posted with an effective date of 11-29-07. These are their own documents. So the idea that there was accumulated interest here that somehow absolved them of the fact that they not only failed to disclose this document during the first seven years of this litigation but relied on an inaccurate and misleading escrow history, which even their own witnesses say was inaccurate, is absolutely false. In fact, the defendants themselves admit in their brief that there was an escrow overpayment. But they say that it could at most have been only six days. What we have here are conclusions that were based in large part on a declaration which was allowed to be made on summary judgment in reply, which was completely contrary to the representations that that same witness made. The declaration was from Jacqueline Cartmill. Ms. Cartmill said at her June deposition that based on this new escrow history, she could not say whether the prior representations that were made throughout this litigation, that there were no attorney's fees charged, were accurate. This is their own witness. I'm trying to get sort of a big picture here, and I guess I'm just not getting it. I mean, it's obviously an important case. We have all of you high-powered lawyers here filing 70-page briefs. It must be important. One issue might be class action, I'm thinking, because there was a class action, and maybe this is sort of the remains of a class action. But I'm wondering, do the issues that remain in this case, are they the ones that the class action related to? Well, Your Honor, there was no class action motion made here because the class was struck. So was the class that you wanted to bring, was it going to relate to these things? These exact claims, Your Honor. The question, as this Court indicated ---- Is getting something and then getting it back four days later is something that you would file a class action about? Is that the $69 or the $350? When you say getting it back four days later, there's no evidence what's ---- Whether they did or they didn't. There's no ---- Your Honor, late fees after acceleration are illegal. And if it was done to one party, it was done to tens and tens of thousands. No, it's about legal fees, which are illegal under Ohio law, Your Honor. You can't charge fees which are not allowed under the FDCPA. I'm only relying on the law, Your Honor. I'm only relying on this Court's decision. I get at what it's all about. It's about ---- It's about particular examples of congenital or repetitive kinds of violations, according to your allegations. I believe that it is. Another allegation here, Your Honor, relies on the fact that in the 2007 foreclosure, we had a plaintiff at the first mortgage holder sues the second mortgage holder. They are supposedly different entities. That issue is not before us now. What? Or it is. Yes, it is. Yes, it is.  It's your issue, isn't it? The issue, it's the issue of whether summary judgment was properly granted, whether a party can charge legal fees for defending itself in an action brought by it against itself. There is not a single case. Which of these issues is there? I'm looking at your table of contents. Whether, it's in the brief, Your Honor. It goes to the question. You have a lot of background. It goes to the question of summary judgment. It goes to the question of whether legal fees, these legal fees and expenses, which were charged by an entity which was being sued by itself, whether that's proper. We have, number one, a misrepresentation that was made in the 2008 foreclosure because they're not two entities. Your Honor, it is. In the argument I'm talking about. In the argument? Where in your argument? I didn't take you to be arguing that. In the brief, Your Honor? The thrust of the argument seemed to be whether they actually charged you attorney's fees. Now you're talking about whether it was legitimate to charge attorney's fees if attorney's fees were charged. No, these were charged, Your Honor. Okay. These attorney's fees were charged. Attorney's fees were charged by the Lerner Sampson firm. There is no dispute that those attorney's fees were charged, Your Honor. That's a fact that's not disputed. We had an 11th hour claim six years into this litigation in Ms. Quartmill's October 30th, 2015 declaration that lo and behold, these attorney's fees were in fact returned way back in 2008. That's enough. You'll have your two minutes. All right. Mr. Pope. Members of the Court, good morning. Russell Pope on behalf of Barclays and Wells Fargo. Let me jump right into a couple of the points that Mr. Grobman made, particularly in response to questions from the bench. I want to address, first of all, very quickly this issue of concealment and this reference to the second escrow history. I want to just say at the outset a statement that I don't believe opposing counsel can contest, and that is every single document that we have in this case responsive to his requests, whether formal or informal, during 30B6 depositions were produced to him. The last installment of those documents came three weeks after the discovery cutoff when my client Barclays informed me they had discovered some additional responsive records. Within a matter of four days, I turned them around and produced them to opposing counsel, which allows me to say this to the Court, and that is that there was plenty of time, even though it was three weeks out of the discovery cutoff, for Mr. Klein to have everything that we have to be able to oppose summary judgment, as he did roughly six months later, and to make all arguments to the Court that, in fact, he did make. There was no concealment of discovery. There was no hiding the ball from him. And I want to make sure the Court is clear on that. The escrow history is an issue that was an anomaly in this case because when a loan is paid off and the borrower was released from his obligations under the note and the mortgage, typically a servicer like Barclays was acting in this case takes that money and based upon investor guidelines and its own priorities, will shift those monies around after giving full credit to the borrower and releasing the borrower from his obligation. The payoff was received in post on December 3, 2007, and the transactions that Mr. Klein disputes here today deal with the reallocation of those funds after the fact after December 3. Those are typically done in a suspense account and not in a recorded escrow account as they were here. What interest would, if the borrower's obligations have already been discharged, what's the interest of the borrower in these kinds of accounting things after the fact? None, Your Honor. None because these are wholly within the discretion and the accounting priorities of the investor and the servicer. So your position would be that whatever you did, it's not Mr. Klein's problem, even if what you did was improper. I understand you probably don't want to concede that. Well, if Mr. Klein can establish that there was something done improper in regard to the payoff itself or the way that he was given credit for those payoff funds, then I would concede that point. But in terms of there being no proof of that, and our position is there is none in this case, that the bank is entitled to do what it did here and that is to make these reallocations for purposes of accounting and investor accountability. I want to ask you the question that I asked your adversary about this repayment, which he says that refunds, pardon me, he said there were never any refunds. But assuming hypothetically that a creditor did refund immediately an improper payment, is there a basis in law for that creditor to be held liable under the FDCPA, where there's an improper payment and the creditor then refunds that? Your Honor, there's not an FDCPA claim pending against my clients. I didn't brief that issue, and so I'm going to plead ignorant here this morning. I'm just not an expert on FDCPA.  I'll ask it down the line. Whose issue is that? I believe it's the next two attorneys who will fortunately follow me, Your Honor. Okay. So you'll just hold the question and just answer it when you get up. Thank you, sir. Yes, ma'am. So I want to, having talked about the escrow history and the allegations of concealment and discovery, I do want to talk about this issue, again, that Mr. Grobman highlighted, and that is an alleged inconsistency between Ms. Cartmell's affidavit and what she said in her testimony just weeks prior to the submission of that affidavit. What she said in her testimony, and this is important, is simply that because of the nature of the way that this post-payoff allocation is done, and by the way, it deals with what the banking industry calls corporate advances, expenses that are dispersed on the part of the servicer that later are recoverable, sometimes from the borrower, sometimes from the investor, depending on what type of expense it is. But there was this $2,000, $2,000-odd corporate advance balance after the payoff, after December 3rd. What Ms. Cartmell testified in her deposition was because the transactions that took place in the escrow account record, but which should have been in the suspense account, are done on a gross basis, rather than on a line-item basis where you provide an offsetting credit for a debit, or the flip side, an offsetting debit for a particular credit. It's done on a gross basis. So what you have, for example, is in this case $2,000 in corporate advances. You have the $412 that Ms. Cartmell testified in the affidavit was reallocated after the payoff. Then you have $2,205 that comes in from the investor. So you have this money that's swirling in an account that she characterized like a checking account at your bank, where you have debits and credits. A particular deposit may not correlate to a particular debit, but at the end of the day, you have to have a balance. And that's what this reallocation was all about. All she testified to in deposition, all she said was because of that nature of the reallocation, I can't pinpoint a particular dollar that came in through one channel to a particular expense that went out the other. So we have a $510 Reimer-Lorber attorney's fee invoice that's at issue as part of this $2,000 corporate advance balance. What she was saying, I can't say whether any or all of the $412 that we received from Mr. Klein's payoff and reallocated went to that 510, or whether it was the $2,205 number that came from Merrill Lynch that ended up paying that. And nobody accounts for it at that level. That was her testimony, and there's nothing inconsistent about that with what she said in her affidavit. I want to talk now about the arguments about the issue of the overpayment of interest. There is no question but that the payoff quote that was given to Mr. Klein in 2007 included interest through an assumed payoff date of December 9, 2007. The proceeds were received and applied to satisfy that on December 3rd, so we have six days of additional interest that was paid at the rate of $42 a day, as Mr. Grobman just articulated. Doing simple math on that, that's a $253 overpayment of interest. What he's complaining about when he sees the Cartmill affidavit, which really just says two things, that a $412 amount was reallocated from the total proceeds of the payoff from accrued interest, and second, that the $350 Lerner-Sampson attorney fee, which is at issue in this case, was refunded to the borrower. They challenged both of those points by saying that Ms. Cartmill lied, and in fact that I suborned perjury by offering that affidavit to the court. The bottom line is simply this. The record does not reveal the information that is required to support the allegations the appellant is making. And by that I mean this. When you raise for the first time in a seven-year-old case that interest is overpaid and you didn't account for it appropriately in your reallocation, and you do that seven years in after 500 pleadings have been filed, only six days before judgment was entered, okay, there is no opportunity for anybody to supplement the record after discovery. And in fact, that's why Sixth Circuit law states that you cannot do that. You cannot raise a new issue or an argument in response to summary judgment. Good morning. May it please the court, my name is Lori Brown, and I represent the Reimer Law Company in this action. I wanted to clarify a few issues here first. The plaintiff has brought two claims for improper assertion of legal fees or for improper billing of legal fees. With respect to the Reimer Law Company, the plaintiff has alleged that the Reimer firm sought to collect and collected attorney's fees with respect to the payoff of his loan. And first I want to point out, it's important to point out, that there was no allegation in the complaint that, or the amended complaint that the Reimer firm improperly sought to collect or collected any of these attorney's fees or that they overcharged interest. Even if there was an allegation in the complaint, the evidence was that the Reimer firm did not bill or collect attorney's fees, and there's no evidence or claim that it misrepresented any amount of interest. You raised the issue of the payoff quote. And the payoff quote contains, every item contained on that payoff quote was permissible. My client testified in an affidavit, Daryl Gormley, that he went through all of the fees and costs and expenses that were contained on the services payoff quote, made sure that they were all permitted under Ohio law, made sure they were all permitted under Ohio law, and specifically stated in the payoff quote that attorney's fees were not included on this. So my client provided the payoff quote from his client, they ensured that it contained the proper expenses, they clarified it did not contain attorney's fees because they were not permitted, and after the closing provided a copy of this escrow history showing that there was a zero balance. It showed that there was no post-acceleration late fees, and it showed that there was no attorney's fees included. Plaintiff presented no evidence that there were any attorney fees that were collected from my client. The plaintiff also cited to no legal authority that would hold the Reimer firm liable based on how the expenses were handled by the servicer after the loan was satisfied and released, or how the loan proceeds were allocated after the closing. None of this created an issue of fact or an inference that the Reimer firm engaged in any unfair or unconscionable debt collection. Go back to this post-acceleration fee. I think you said that there was a $69.12 post-acceleration fee. Reimer didn't collect that fee. But then it shows in the transaction history a late charge of $69.12 on November 16th,  and there was testimony by Mr. Pierre, I believe, that he paid that fee. Are those statements not reconcilable? Well, the statement made by my client, my client included only the $178 pre-acceleration late fee. That was the only late fee that was included in the payoff. My client also produced an escrow, and that's document 414-10, and it's page ID 6137. And that escrow shows that the $178.90 late charge was assessed. That was a pre-acceleration late charge. That $69.12 late charge assessment was not included in the payoff quote that my client presented. So that number was not included and was not included in what Mr. Klein was charged. My client produced this escrow sheet after the fact, in February, after the loan had closed, after it paid off. Mr. Klein's counsel, he was represented by counsel in the state foreclosure action, he asked for an identification of all the charges that were contained in the payoff, all the invoices, all the backup documents, and we produced it. So this $69. . . Even though it was in the transaction history, he didn't pay it. He did not pay that $69. . . It shows a reversal. The only amount that was included in the check that he paid was $178.90. Is there any evidence to the contrary in this record? There's no evidence to the contrary in this record, no. The plaintiff has not presented any evidence to the contrary. That he actually paid the $69. . . That he actually paid that $69. . . All right. Your time is up if there aren't any other questions. All right, Mr. de Blasio. Mr. de Blasio. I gobbled your name. Thank you, Judge. It's Rick de Blasio. You're not the first. May it please the Court, my name is Rick de Blasio. I represent the defendant, Appellee Lerner, Sampson, and Rothfuss. We sometimes refer to it as LSR. There are two claims that Mr. Klein brought against Lerner, Sampson, and Rothfuss. One under the FDCPA, and one for unjust enrichment. But the undisputed evidence is clear, and it shows that, number one, in terms of FDCPA, LSR was not engaged in debt collection by this Court's own definition. Two, even if LSR were engaged in debt collection, the sums that Mr. Klein paid were completely appropriate under Ohio law. And three, Mr. Klein had no damages on the date he filed this suit. Now, the Court has asked about the timing of the refund and whether that impacts his damages and whether he has a claim. And we believe that the timing of the refund is very important, in this case especially, because Mr. Klein paid the full amount of the second mortgage, and then less than 30 days later, he received a refund of the legal fees, $350, that were charged to him in the payoff letter. He filed suit 11 months after that. So on the date he filed suit, according to the District Court, he had no damage. All he had was statutory damage. He had a claim, he thinks, for violation of the FDCPA, which, of course, we dispute. But he had no damages at that time, and therefore the District Court found that he was prevented from filing suit where he had no damages. Did the District Court also rely on an admission in this case? Yes. In that regard? Yes. Was that an alternative basis? Yes, it was. We sent out admissions. I'm sorry, Your Honor. Was that an alternative, sufficiently dispositive basis for ruling in your favor without getting into the issue that you just mentioned? You can. That's all I ask. Yes. Thank you, Your Honor. We refer this Court to the two cases that we think are most important about the FDCPA claim, and that would be Gurdon and Goodson. And, of course, Goodson is Judge Rogers' opinion. And in those cases, this Court found it important whether a debt collector's animating purpose of the letter is to collect a debt. Our firm, in this case, was simply filing a protective answer. Our client was sued, filed an answer saying, Protect our interests, never sought to collect anything from Mr. Klein. At the end of the case, he asked us for a payoff statement. It was his request. We never intended to collect anything. We were never hired to collect anything. We sent him that. Under this Court's cases, that is not debt collection. Thank you, Your Honor. I see my time is up. I appreciate your patience. Good morning. May it please the Court. I'm Douglas Riley here on behalf of MERS. And for the first time in my long career, I can honestly say I shall be brief. Mr. Klein asserted three counts against MERS, each requiring a finding that either we had collected improper fees or that we had failed to refund an overpayment. As my colleague has pointed out and as our briefs have shown, Mr. Klein has failed to establish a material dispute as to these fees. And accordingly, Judge Rice ruled properly in ruling in favor of MERS on Count 1, which dealt with TILA, and Count 2 on the Ohio Consumer Sales Practices Act, and on Count 5 under breach of contract. Mr. Klein does not point to any substantive evidence that Judge Rice overlooked. But instead, his principal argument is that if he only had more time for discovery, he might yet uncover materially misleading facts and practices by MERS or the other defendants. But Judge Rice, who showed extraordinary patience with regard to the pacing of this very old lawsuit, finally decided that after seven years, his allegations could not be proven. They could not be sustained. And he ruled, and we urge you to affirm his ruling. Thank you. Judge Donald, I believe you hit the nail on the head when you asked about the transaction history. What happened was that the legal fees and expenses we're talking about weren't in the initial letters. They were concealed. They were concealed because they filed an escrow history, which was inaccurate, which showed that there was an escrow balance of over $482, and which showed that there were then deductions, which were also concealed, which reduced that amount to zero. Ms. Brown said that there was no evidence when asked whether a late fee was collected. Here is Mr. Perry. Question. He was charged at least one paced acceleration late fee. Is that correct? I don't know, sir. It depends on the definition of charge. He was presented with an invoice. He paid it, and then they realized an error, and they corrected it. He would have received an escrow check of $69.12, the question, and 12 cents. I ask, to the extent that such a check exists, I would request that it be provided. There is no evidence of payment. No evidence of payment. That's an affirmative defense. And Ohio courts and federal courts have said that you've got to show that there was payment. So the idea that there's no evidence of a late fee is absolutely incorrect. In fact, it was charged. Judge Gibbons, you asked about what interest Mr. Klein has. The question should be, if you go to a grocery store and they overcharge you for $100, the transaction is complete. What interest do you have in getting that money back? He was overcharged. That's the interest. His contractual rights don't end. His right to make sure that they don't fraudulently overcharge you. The point that was being made was that a lot of this shifting around that you're complaining about really had nothing to do with your client, because it all happened after he had been released from any liability. And it's internal as to them. Your Honor, in the same respect as in a grocery store, he was overcharged for interest. They owed him that money. He paid more. He got. Where? They say. They say, Your Honor. I believe it is supported by the record. And it was a long time before he filed suit, I believe was the point. A long time before? No. Actually, Your Honor, we're talking about an escrow history. He didn't even know about this escrow balance or these two transactions, because they supplied an inaccurate escrow history. The point is a simple. Your time is up, Mr. Groban. Thank you, Your Honor. You're not allowed to charge excess interest. We appreciate the argument all of you have given, and we'll consider the case carefully.